160 P.3d 577 (2007)
2007-NMCA-056
STATE of New Mexico, Plaintiff-Appellee,
v.
Daniel Ben TRUJILLO, Defendant-Appellant.
No. 25,898.
Court of Appeals of New Mexico.
March 7, 2007.
Certiorari Granted April 20, 2007.
*578 Gary K. King, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, NM, for Appellee.
John Bigelow, Chief Public Defender, Trace L. Rabern, Assistant Appellate Defender, Santa Fe, NM, for Appellant.
Certiorari Granted, No. 30,318, April 20, 2007.

OPINION
KENNEDY, Judge.
{1} Defendant Daniel Trujillo appeals from an order of the district court finding him incompetent to stand trial, mentally retarded as defined by NMSA 1978, § 31-9-1.6(E) (1999), and dangerous because he presents a likelihood of serious harm to himself or others pursuant to Section 31-9-1.6(B). The order further found that there is not a substantial probability that Defendant will ever become competent to stand trial. The order was filed on June 15, 2005, and an application for interlocutory appeal was timely filed on June 27, 2005. The district court found that because Defendant was not charged with one of the enumerated crimes in Section 31-9-1.6(C), the department of health was not required to commence civil commitment proceedings pursuant to the Mental Health and Development Disabilities Code. NMSA 1978, §§ 43-1-1 to -25 (1976, as amended through 2005). Despite this finding, the district court found that the State could proceed to commit or incarcerate Defendant under other provisions of the New Mexico Mental Illness and Competency statute. NMSA 1978, §§ 31-9-1 to -4 (1988, as amended through 1999).
{2} The district court in this case specifically looked to Sections 31-9-1 to -1.5 for authority to hold Defendant longer than permitted under Section 31-9-1.6, despite having found that Defendant had mental retardation as defined in Section 31-9-1.6(E). The tension here arises from the difference between the statutes. Section 31-9-1.6 deals specifically with mental retardation that is considered untreatable, and Sections 31-9-1 to -1.5 deal with incompetence and dangerousness, *579 taking into account the possibility of achieving successful treatment of either condition. See §§ 31-9-1.5, -1.6. The crucial difference between the statutes is the disposition of the cases. Under Section 31-9-1.6 the disposition is either civil commitment under the Mental Health and Developmental Disabilities Code, or dismissal fourteen months from the court's determination of incompetency; under Section 31-9-1.5(D) the disposition is continued commitment in a secure, locked facility either until treatment is successful in abating incompetence or dangerousness, or for the duration of the criminal sentence.
{3} We affirm in part and reverse in part. First, we hold that the district court properly applied New Mexico law to the finding that Defendant has mental retardation and affirm. We reverse the district court's finding that the State could seek commitment of a defendant with mental retardation under a statute other than Section 31-9-1.6 and further hold that the State cannot seek commitment under Section 31-9-1.6 because Defendant did not commit nor was he charged with one of the enumerated crimes in Section 31-9-1.6(C).
FACTS AND BACKGROUND
{4} Defendant was indicted on charges of attempted first-degree murder, aggravated burglary, aggravated battery, and tampering with evidence. Defendant allegedly broke into the residence of his employer and attempted to kill him by hitting him with a steel bar in response to his belief that his employer had raped Defendant's pregnant wife. Defendant's IQ is estimated to be in the high fifties to low sixties. Defendant's mental condition resulted from a traumatic brain injury caused by carbon monoxide poisoning when Defendant was in his late twenties. Defendant is now in his mid-forties.
{5} Before we summarize the proceedings below, it is helpful to outline the various statutes relied upon by the district court. The Mental Illness and Competency statute sets out the means by which a defendant's competency may be raised and determined. See § 31-9-1 (outlining the procedure for raising the issue of a defendant's competency); § 31-9-1.1 (providing for professional evaluation of competency and the requirements for hearing). As noted above, incompetence due to mental retardation and incompetence due to other mental impairment are subject of different statutes and procedure. Once a court determines that a defendant is incompetent, the statute dictates the court's actions.
{6} If a court concludes that a defendant is incompetent to proceed to trial and that the defendant is dangerous, the court "may commit the defendant . . . for treatment to attain competency." Section 31-9-1.2(B). The statute states that "`dangerous' means that, if released, the defendant presents a serious threat of inflicting great bodily harm on another" or of committing criminal sexual penetration or criminal sexual contact with a minor. Section 31-9-1.2(D).
{7} The statute further provides for periodic review of the defendant's competency, progress toward competency, and dangerousness. Section 31-9-1.3. Under Section 31-9-1.4, if a court "determines that there is not a substantial probability that the defendant will become competent to proceed in a criminal case" within a certain time frame, the court may dismiss the charges or, if the defendant is charged with certain felonies, the court may conduct a hearing under Section 31-9-1.5. The latter section requires the court to conduct "a hearing to determine the sufficiency of the evidence if the case is not dismissed" and if the defendant is charged with certain crimes. Section 31-9-1.5(A). Upon making certain determinations after the hearing, the statute instructs the court to dismiss the charges, whereupon the state may initiate commitment proceedings under the Mental Health and Developmental Disabilities statute. See § 31-9-1.5(B), (C). However, "[i]f the district court finds by clear and convincing evidence that the defendant committed [an enumerated felony] and enters a finding that the defendant remains incompetent to proceed and remains dangerous," then "the defendant shall be detained by the department of health in a secure, locked facility" until further order of the court or "upon expiration of the period of time equal to the maximum sentence to which the defendant would have been subject *580 had the defendant been convicted in a criminal proceeding." Section 31-9-1.5(D).
{8} The other statute at issue in this case is Section 31-9-1.6, which provides for a court's determination of whether the defendant has mental retardation, which is defined as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior. An intelligence quotient of seventy or below . . . shall be presumptive evidence of mental retardation." Section 31-9-1.6(E). If a court finds that a defendant "has mental retardation and that there is not a substantial probability that the defendant will become competent" within a certain time frame, "the department of health shall perform an evaluation to determine whether the defendant presents a likelihood of serious harm to himself or a likelihood of serious harm to others." Section 31-9-1.6(B). If the court then finds such likelihood, and if the defendant is charged with certain crimes, "the department shall commence proceedings" under the Mental Health and Developmental Disabilities statute. Section 31-9-1.6(C). Under Section 31-9-1.6(D), the district court must dismiss the charges against the defendant without prejudice after the hearing under the Mental Health and Developmental Disabilities statute, or "upon expiration of fourteen months from the court's initial determination that the defendant is incompetent to proceed in a criminal case." Section 31-9-1.6(D).
{9} Upon a motion to determine competency from the defense, the district court ordered Defendant to undergo psychological testing. The defense had Defendant evaluated by Dr. Westfried, who determined that Defendant was incompetent to stand trial. The district court found Defendant incompetent to stand trial. The defense also thereafter filed a notice of mental retardation, notifying the district court that it was likely that Defendant had mental retardation under the definition in Section 31-9-1.6. On July 27, 2004, the district court ordered Defendant committed to Las Vegas Medical Center for a determination of competency to stand trial based on mental retardation pursuant to Section 31-9-1.6. Dr. Wilkins evaluated Defendant and found that Defendant was not competent to stand trial and was unlikely to be treated to competency. Both parties stipulated as to the competency determination and the district court reaffirmed its finding that Defendant was incompetent to stand trial. The court held a hearing and found that Defendant had mental retardation pursuant to Section 31-9-1.6(E). Further, the court found that Defendant was "dangerous in that he presents a likelihood of serious harm to himself or a likelihood of serious harm to others, pursuant to [Section] 31-9-1.6(B)."
{10} During the second hearing on competence, the court asked how it was to address the issue of dangerousness. Dr. Wilkins' findings were discussed because the doctor found a moderate risk for serious violence. The defense posited that Dr. Wilkins had already performed an evaluation under Section 31-9-1.6(B) and found that Defendant was dangerous under Section 31-9-1.5, and that this evaluation necessitated the finding that Defendant presented a serious risk of harm to himself or others. However, the State argued that the determination that the doctor made was based on the Section 31-9-1.5 standard for dangerousness and was not an equivalent standard because the definition in Section 31-9-1.6 contemplates a risk of substantial danger to oneself or others.
{11} The court then concluded, as a matter of law, that because Defendant was not charged with one of the enumerated crimes in Section 31-9-1.6(C), he was not required to be committed by the department of health under the Mental Health and Developmental Disabilities Code. Additionally, the court found that, although there was no mandatory commitment, and because public policy favored protecting the public from dangerous and incompetent persons, the State could commit him under the Mental Illness and Competency statute. See §§ 31-9-1 to -1.5.
DISCUSSION
{12} There are two issues discussed in this appeal: (1) whether Defendant should be considered as being affected with mental retardation under New Mexico law, and (2) whether Defendant should be committed under Sections 31-9-1 to -1.5.
{13} We review the district court's determination of mental retardation de novo, since *581 applying a statute to the facts of this case involves a question of law. See State v. Romero, 2006-NMCA-126, ¶ 5, 140 N.M. 524, 143 P.3d 763.
Does Defendant Have Mental Retardation?
{14} Section 31-9-1.6(E) defines mental retardation as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior." An IQ of seventy or less constitutes "presumptive evidence of mental retardation." Id. The Diagnostic and Statistical Manual of Mental Disorders (DSM) is fully congruent with these two criteria, but adds an additional element: the onset of mental retardation must occur before the age of eighteen. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 49 (4th ed.2000) (hereinafter DSM-IV-TR). The difference between the New Mexico statute and the clinical definition under the DSM is a fundamental issue to this appeal.
{15} The defense contends that the definition of retardation under Section 31-9-1.6(E) controls the outcome of this issue. At the trial court level, the State conceded that Defendant met the presumptive standard for mental retardation under the statute, but argued that the State could rebut that presumption. The State specifically acknowledged that the New Mexico statute does not require a finding of onset of mental retardation before the age of eighteen, and that under New Mexico law, Defendant fit the criteria for a determination of mental retardation. The State then agreed with the defense that the court must apply the New Mexico statute to Defendant.
{16} On appeal, the State argues that Defendant should not be considered as being affected with mental retardation. The State sets forth two arguments reasoning that Defendant should not be considered as being affected. We shall discuss those arguments in turn.
{17} First, the State argues that irrespective of the statute's silence on the subject, the New Mexico legislature intended for Section 31-9-1.6(E) to include onset of retardation before the age of eighteen, pointing to the DSM for support. The State argues that because the DSM requires onset before the age of eighteen, and the United States Supreme Court has "endorsed" this position, the New Mexico legislature could not have possibly intended to leave out this requirement. See Atkins v. Virginia, 536 U.S. 304, 308 n. 3, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (noting that both the American Association of Mental Retardation and the American Psychiatric Association use the age of onset as part of their criteria). That the United States Supreme Court might cite to these standards in passing is not dispositive here, and we are not persuaded that the New Mexico legislature intended there to be a third component of the mental retardation statute.
{18} "[W]hen a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." State v. Rivera, 2004-NMSC-001, ¶ 10, 134 N.M. 768, 82 P.3d 939 (internal quotation marks and citation omitted). The ultimate goal of statutory interpretation is to give effect to the legislature's intent. State v. Cleve, 1999-NMSC-017, ¶ 8, 127 N.M. 240, 980 P.2d 23. We cannot read into the statute any words that are not there, particularly when the statute is complete and makes sense as written. See Burroughs v. Bd. of County Comm'rs, 88 N.M. 303, 306, 540 P.2d 233, 236 (1975).
{19} When it enacted Section 31-9-1.6(E) in 1997, the legislature did not indicate that it intended for the statute to be read in concurrence with the DSM. The State does not now point to any authority by which the DSM definition should supplant the New Mexico legislature's enactment. Further, the legislature did not indicate that it intended to include a third prong of the elements for a finding of mental retardation. In 1997, the DSM-IV was in existence. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed.1994). It defined mental retardation as noted above, including an onset before age eighteen. After age eighteen, the onset of limited intellectual functioning that would *582 otherwise qualify as retardation under the DSM qualifies as dementia. "A diagnosis of dementia requires that the memory impairment and other cognitive deficits represent a significant decline from a previously higher level of functioning." DSM-TR, 47. State legislatures are not bound to adopt the DSM standard. Statutes taking a more flexible approach than simple cutoff IQ scores have gone outside the DSM definition. Lisa Odom, Note, Jumping on the Bandwagon: The United States Supreme Court Prohibits the Execution of Mentally Retarded Persons in Atkins v. Virginia, 31 Pepp. L.Rev. 875, 907-08 (2004) ("Of the eighteen states with legislation banning the execution of the mentally retarded, Arizona, Colorado, Connecticut, Florida, Georgia, Indiana, Kansas, Missouri, New York, and the federal government have adopted flexible standards for determining mental retardation, thereby not specifically including an IQ score.").
{20} Similarly, states like New Mexico and Nebraska that do not include age of onset are following another recognized policy, namely including similar mental disabilities for similar treatment. See Neb.Rev. Stat. § 28-105.01 (2002 and Supp.2004); see also NMSA 1978 § 43-1-3(H) (2005). New Mexico's Mental Health and Developmental Disability Code defines "developmental disability" as "a disability of a person which is attributable to mental retardation . . . or neurological dysfunction which requires treatment or habilitation similar to that provided to persons with mental retardation." Section 43-1-3(H). Eliminating the requirement that retardation originate prior to age eighteen serves an important purposethe inclusion of like disorders to retardation that have later onset and causes yet retain the basic criteria of limitations in intellectual functioning and adaptive behavior. The recommendation of the American Bar Association to states in the wake of Atkins is almost identical to the New Mexico definition of mental retardation, expressly showing this intent by calling for an exemption from capital punishment for persons demonstrating "significant limitations in both their intellectual functioning and adaptive behavior, as expressed in conceptual, social, and practical adaptive skills, resulting from mental retardation, dementia, or a traumatic brain injury." Recommendations of the American Bar Association Section of Individual Rights and Responsibilities Task Force on Mental Disability and the Death Penalty, 54 Cath. U.L.Rev. 1115 (2005); see Christopher Slobogin, Mental Disorder as an Exemption from the Death Penalty: The ABA-IRR Task Force Recommendations, 54 Cath. U.L.Rev. 1133, 1136 (2005) ("[T]he only significant characteristic that differentiates these severe disabilities from mental retardation is the age of onset."). We decline to provide a criterion for retardation in the statute that the legislature itself declined to write, and which appears from the literature to have its unequivocal language rooted in sound policy that recognizes both the difference between retardation and other disorders, and accommodates the similarities between retardation and some other developmental disabilities that should be treated alike.
{21} Second, the State attempts to rebut the presumption that Defendant has mental retardation based on his IQ score. See § 31-9-1.6(E). Section 31-9-1.6(E) states "[a]n intelligence quotient of seventy or below on a reliably administered intelligence quotient test shall be presumptive evidence of mental retardation." The State argues that neither doctor who evaluated Defendant made a finding of mental retardation. Instead, the doctors that evaluated Defendant made a finding of dementia, coupled with an IQ in the high fifties to low sixties. As noted above, the finding of dementia is required under the DSM (as a clinical diagnosis) because the age of onset was after Defendant turned eighteen. New Mexico does not follow the DSM standard. The legislature added a presumption that an IQ under seventy would be a basis for a finding of mental retardation. The district court had the clinical reports before it, and specifically found that Defendant had mental retardation pursuant to the statute. We conclude that the presumption provided in Section 31-9-1.6(E) has not been rebutted and it was appropriate for the district court to find Defendant to have mental retardation. Accordingly, we affirm the district *583 court's finding that Defendant is afflicted with mental retardation pursuant to the definition in Section 31-9-1.6(E).
Can Defendant Be Confined Under Section 31-9-1.5?
{22} Our next question is whether Section 31-9-1.6 is the sole source of authority to confine incompetent defendants with mental retardation who are dangerous. This issue arises from a tension between different sections of the Mental Illness and Competency statute, and the district court's conflating incompetency and retardation to accomplish a remedy to keep Defendant in custody. Section 31-9-1.5 provides that incompetent, dangerous persons who committed one of a list of felonies may be confined for treatment to competence, to non-dangerousness, or for the period they could have been confined to prison if they had been convicted. In that instance, "dangerous" means that the defendant "presents a serious threat of inflicting great bodily harm on another," or committing a sex crime. Section 31-9-1.2(D). The district court did not specifically find dangerousness under this section.
{23} The district court concluded that Defendant met the statutory definition of mental retardation under Section 31-9-1.6(E) and that Defendant was incompetent. The district court also found that Defendant was dangerous because "he presents a likelihood of serious harm to himself or a likelihood of serious harm to other pursuant to [Section] 31-9-1.6(B)."
{24} In ascertaining the legislature's intent in enacting both Sections 31-9-1.5 and 31-9-1.6, we conclude that the legislature intended for Section 31-9-1.5 to apply to incompetent and dangerous persons, not to persons who have mental retardation. We explain our rationale as follows.
Section 31-9-1.6(D) Created a Specific Procedure for Persons Who Are Incompetent Because of Retardation
{25} In 1988, the New Mexico legislature enacted the Mental Illness and Competency statute. Originally, Sections 31-9-1.2 to -1.5 applied to all incompetent defendants. The legislature, by enacting Section 31-9-1.6 in 1997, carved out a special procedure for persons who are incompetent by reason of their mental retardation. In adding Section 31-9-1.6, the legislature provided procedures separate and distinct from those established by Sections 31-9-1.2 to -1.5.
{26} The legislature was clear in its drafting of Section 31-9-1.6. In following our rules of construction, we presume that the legislature, in enacting Section 31-9-1.6, was fully aware of Section 31-9-1.5 and that Section 31-9-1.6 was intended to complement Section 31-9-1.5, rather than act in conflict with it. When the legislature makes a substantial change to the law, we assume such a change is intentional. See State v. Adam M., 1998-NMCA-014, ¶ 21, 124 N.M. 505, 953 P.2d 40. Given that persons with mental retardation have been given different treatment because of the differing nature of their mental condition than other incompetent defendants, this distinction drives the statutory difference.
{27} The district court found that Defendant would likely never be considered competent. Although the State argued below that Defendant's IQ might improve with treatment, Dr. Wilkins' report stated that "prognosis for any further recovery is poor due to the length of time since the brain trauma. [Defendant] is likely functioning at his highest level at the present time." This finding is not disputed.
Sections 39-1-1.5 and 39-1-1.6 Are Distinct
{28} The scheme for dealing with persons with mental retardation is separate from that addressing persons who are otherwise incompetent. Under Section 31-9-1.5(D)(3), the criminally committed are treated in an attempt to achieve competency, or are released upon being found to no longer be dangerous. Section 31-9-1.5(D)(4)(c). Detentions under Section 31-9-1.5 are predicated on a finding of guilt of the crimes with which the person is charged (albeit to a lower standard than beyond a reasonable doubt). Section 31-9-1.5 allows for permissive civil commitment proceedings outside of the enumerated crimes that are no longer permitted under Section 39-1-1.6. For a person who has mental *584 retardation and who is determined to be incapable of reaching competency, the scheme under Section 31-9-1.5 fails to adequately address the problem.
{29} Section 31-9-1.6 deals with the specific subset of incompetent defendants who have mental retardation. If such a person is found to be dangerous after an evaluation ordered by the district court and if the person has been accused of certain enumerated crimes that are not concerned in this case, the department of health is compelled to begin civil commitment proceedings against the defendant. Section 31-9-1.6(C). Subsection (D) of this section provides that after the commitment hearing under Subsection (C) or after the passage of fourteen months from the court's determination that the defendant is incompetent, the charges against the defendant "shall be dismissed without prejudice." Section 31-9-1.6(D).
{30} The district court concluded that if a person could not be committed under Section 31-9-1.6(C), then Subsection (D) was "not applicable," and that if the State then chose to proceed, it was "required to proceed under [Sections] 31-9-1.2 to 31-9-1.5" so as to give "effect to all portions of the statute." The district court read one of the purposes of the Mental Illness and Competency statute as being "to protect society by detaining dangerous, incompetent defendants for the maximum duration of their potential sentence." The court concluded that "[t]he State is therefore allowed to commit a mentally retarded individual under other provisions of the Mental Illness and Competency code and is not required to proceed only under [Section] 31-9-1.6." Although it may seem to the State and the district court that it makes no sense to release a defendant who has mental retardation on less than might accrue to a defendant who is incompetent for other reasons, "we presume that the [l]egislature knows the law and acts rationally." Bybee v. City of Albuquerque, 120 N.M. 17, 20, 896 P.2d 1164, 1167 (1995).
{31} We disagree with both the district court's limited view of the purposes of the Mental Illness and Competency statute, and its effect. As to the former, the case cited by the district court, State v. Gallegos, 111 N.M. 110, 802 P.2d 15 (Ct.App.1990), recognizes three purposes for the statute: (1) protecting an incompetent defendant from being held on meritless charges only by virtue of his incompetence by providing for dismissal of the charges when the State cannot prove a defendant's guilt by a preponderance of the evidence; (2) protecting society by detaining a dangerous, incompetent defendant for the maximum duration of the potential sentence, when a preponderance of the evidence indicates that the defendant committed the crime; and (3) providing "an orderly and progressive method of evaluating and treating defendants who can be returned to competency within a reasonable amount of time and a fair method of detaining incompetent, dangerous defendants who cannot." Id. at 114-15, 802 P.2d at 19-20. The statute's overriding purpose is to provide due process protections to incompetent defendants. Id. at 114, 802 P.2d at 19.
District Courts Have an Option Without Section 31-9-1.5
{32} Even having concluded that the district court erred in looking to Section 31-9-1.5 for a means to confine Defendant, we note that a district court is not without options. While civil commitment proceedings under Section 31-9-1.6(D) are mandatory when a person with mental retardation is charged with certain enumerated crimes, if the defendant is not charged with one of the specified crimes but is still found to be dangerous, nothing precludes a district court from dismissing the criminal case without prejudice and referring the case to the district attorney for civil commitment proceedings under Section 43-1-1. See § 43-1-1(E) (granting the district court the authority after an evaluation to "dismiss the charges without prejudice and refer the defendant to the district attorney for possible initiation of proceedings under the Mental Health and Developmental Disabilities Code"). Although amendments to Section 31-9-1.6 in 1999 removed specific mention of the department of health's discretion to pursue commitment of a dangerous defendant accused of crimes not listed in Section 31-9-1.6(C), it did not limit the authority of the district *585 court under Section 43-1-1(E) to make a referral to the district attorney to consider commitment proceedings.
{33} Section 43-1-1 retains the ability of a district court to dismiss and recommend commitment after dismissal following the removal from Section 31-9-1.6(C) of mention of permissive commitments at the department of health's discretion under Section 31-9-1.6(C) for dangerous defendants accused of non-enumerated crimes. While the amendment strengthened procedural protections afforded to defendants with mental retardation by requiring greater judicial participation, the ability to civilly commit such a person remains undiminished. It is there the district court's answer lies, not Section 31-9-1.5.
CONCLUSION
{34} While affirming the district court's determination that Defendant has mental retardation under Section 31-9-1.6(E), we reverse the district court as to its interpretation that a person who has mental retardation can be confined pursuant to any provision of the Mental Illness and Competency statute than Section 31-9-1.6. We remand with instructions to dismiss the charges against Defendant.
{35} IT IS SO ORDERED.
I CONCUR: CYNTHIA A. FRY, Judge.
JAMES J. WECHSLER, Judge (concurring in part and dissenting in part).
WECHSLER, Judge (concurring in part and dissenting in part).
{36} I agree with the majority that the district court did not err in concluding that Defendant has mental retardation as defined by Section 31-9-1.6(E). I also agree that Section 43-1-1 provides authority enabling the district court to refer defendants such as this one to the district attorney for civil commitment. However, I dissent from the majority's conclusion that Sections 31-9-1 to -1.5 do not apply to defendants who are incompetent to stand trial due to mental retardation.
{37} The ultimate question in construing statutes is legislative intent. State v. Baca, 2005-NMCA-001, ¶ 9, 136 N.M. 667, 104 P.3d 533. We view each statute in light of its history, the overall legislative scheme, and "the clear policy implications of its various constructions." State v. Smith, 2004-NMSC-032, ¶ 10, 136 N.M. 372, 98 P.3d 1022. We presume that the legislature is aware of existing law and that it does not intend to enact statutes that are in conflict with existing law. State v. Herbstman, 1999-NMCA-014, ¶ 18, 126 N.M. 683, 974 P.2d 177.
{38} As the majority correctly notes, when Sections 31-9-1 to -1.5 were enacted, they applied to all incompetent defendants, including defendants with mental retardation. Sections 31-9-1 to -1.5 constitute a comprehensive legislative scheme addressing the substance and the procedure of transfer of cases to the district court, the means of determining competency, the temporary commitment of defendants determined to be incompetent, and the treatment of incompetent defendants. Until 1997, when Section 31-9-1.6 was enacted, all defendants who were potentially incompetent were subject to the same procedures and requirements.
{39} In 1997, the legislature enacted Section 31-9-1.6. Section 31-9-1.6 requires a hearing to determine whether a defendant has mental retardation on motion of the defense. Section 31-9-1.6(A). If the defendant does have mental retardation and is not likely to become competent, an evaluation is conducted to determine the degree of dangerousness of the defendant. Section 31-9-1.6(B). If the defendant is found to present a serious risk of harm and has committed one of several enumerated offenses, the department of health is required to begin civil commitment procedures. Section 31-9-1.6(C). Finally, Section 31-9-1.6(D) provides that the criminal charges be dismissed without prejudice after the hearing or fourteen months from the initial determination of incompetency.
{40} The majority concludes, in essence, that Section 31-9-1.6 is a comprehensive scheme dealing with defendants who are incompetent by reason of mental retardation and that it therefore replaces Sections 31-9-1 to -1.5 for these defendants. I disagree. I believe that Section 31-9-1.6 was intended merely to supplement the preexisting legislative scheme dealing with incompetent defendants. In reaching this conclusion, I rely on the plain language of the statute and a common-sense interpretation with the goal of *586 determining legislative intent. See Smith, 2004-NMSC-032, ¶¶ 9-10, 136 N.M. 372, 98 P.3d 1022.
{41} First, I begin with the premise that the legislature knew of the existence of Sections 31-9-1 to -1.5 when it enacted Section 31-9-1.6. See Herbstman, 1999-NMCA-014, ¶ 18, 126 N.M. 683, 974 P.2d 177. If the legislature had intended to limit the application of Sections 31-9-1 to -1.5 to defendants who are incompetent by reason of mental illness, as distinguished from mental retardation, it could have amended these statutes to so reflect. See, e.g., State v. Muniz, 2003-NMSC-021, ¶ 11, 134 N.M. 152, 74 P.3d 86. I would not presume that the legislature intended to limit the application of these statutes in the absence of some indication that a limitation was intended.
{42} Second, as the majority's conclusion illustrates, Section 31-9-1.6 is not a comprehensive legislative scheme. It cannot take the place of Sections 31-9-1 to -1.5 for all defendants with mental retardation because it does not address the procedures the district court should follow when dealing with all defendants with mental retardation. Where Section 31-9-1.6 is silent, I would presume that the legislature intended the previously applicable law, which has been neither amended nor repealed, to remain applicable. Sections 31-9-1 to -1.5 should therefore be fully applicable to defendants who have mental retardation, rendering them incompetent but treatable; to defendants who have mental retardation but whose counsel has not requested a ruling on that issue; to defendants who do not pose a serious risk of harm; and to defendants who do pose a serious risk of harm but who have not committed one of the enumerated crimes.
{43} Finally, I believe that Section 31-9-1.6 should not be construed as replacing Sections 31-9-1 to -1.5 for all defendants with mental retardation because such an interpretation is contrary to reason and contrary to public policy. See Gallegos, 111 N.M. at 114-15, 802 P.2d at 19-20 (listing the purposes underlying Sections 31-9-1 to -1.5). Under the majority's interpretation, safeguards in Sections 31-9-1 to -1.5, such as the transfer of cases to the district court, a hearing to ensure that sufficient evidence of guilt exists, and periodic review of the defendant's competency and dangerousness, no longer apply to defendants with mental retardation. Perhaps most importantly, because Section 31-9-1.6 does not address the treatment of defendants who have mental retardation but who may become competent, the district court is no longer able to order temporary commitment for the purpose of treatment. Instead, the majority's interpretation of Section 31-9-1.6 leads to the conclusion that the legislature chose to eliminate these provisions and, instead, to be silent on the treatment of incompetent defendants with mental retardation and the procedures to be followed when an incompetent defendant is not dangerous, has not committed one of the enumerated offenses, or has not requested a hearing under Section 31-9-1.6. I would not interpret Section 31-9-1.6 to create such an unreasonable result, particularly when a reasonable interpretation is possible. See Herbstman, 1999-NMCA-014, ¶ 21, 126 N.M. 683, 974 P.2d 177.
{44} I believe that the legislature intended Section 31-9-1.6 to supplement Sections 31-9-1 to -1.5. Nowhere in Sections 31-9-1 to -1.5 does the legislature require the commencement of civil commitment proceedings. Section 31-9-1.6(C), to the contrary, requires the department of health to civilly commit dangerous defendants with untreatable mental retardation who have committed one of four listed felonies. Because Section 31-9-1.6(C) is a more specific statute, it should govern actions of the district court and the department of health when it is triggered on motion of the defense and when the defendant is found to be incompetent, untreatable, a risk of serious harm, and to have committed one of the listed felonies. When Section 31-9-1.6 is not applicable, however, the district court should proceed under the general statutes addressing all incompetent defendants.
{45} Defendant argued that a conflict existed because a defendant committed under Section 31-9-1.6 could only be confined for fourteen months, whereas a defendant committed under Section 31-9-1.5 could be confined for the extent of his or her maximum possible sentence if convicted. Defendant apparently construed Section 31-9-1.6(D) to contain this limitation. But Subsection D addresses circumstances when charges must *587 be dismissed without prejudice; it does not address the length of commitment. I therefore see no practical conflict in applying Sections 31-9-1 to -1.5 to defendants who are not covered by Section 31-9-1.6.
{46} I therefore respectfully dissent from the majority's conclusion that Sections 31-9-1 to -1.5 do not apply to Defendant. I would affirm the district court's order finding Defendant to have mental retardation and concluding that Defendant could be committed under Sections 31-9-1 to -1.5.